## MOORE *v*. MOSS.

### Opinion delivered April 19, 1915.

REAL ESTATE BROKERS—RIGHT TO COMMISSIONS.—A real estate broker is
 entitled to his commissions when he has been given authority to
 sell the land, and he produces a purchaser ready, willing, and
 able to buy, and the sale is delayed because of acts of the seller,
 but is finally sold to the purchaser procured by the broker.

Appeal from White Circuit Court; *J. M. Jackson*,
Judge; reversed.

STATEMENT BY THE COURT.

The appellee sued the appellants for a commission as
real estate broker, alleging that appellants, on the 20th
day of October, 1909, placed in his hand for sale a sec-
tion of land in White County; that appellants agreed to
pay him 5 per cent commission on the purchase price for
securing a purchaser for the lands; that appellee did pro-
cure one W. P. Porter to buy the land at $13 per acre, and
that appellants were indebted to him in the sum of $406.41
as his commission. The appellants denied the material
allegations of appellee's complaint.

The appellee testified that the agency to sell the lands
was first given him in 1907; that he furnished a plat of
the lands to Porter, and afterward took up the sale of the
lands with him by correspondence, and that appellants
dictated the answers to letters which he received from
Porter; that the lands which Porter bought were listed

with him as many as three times. He exhibited a letter from Porter dated October 21, 1907, in which Porter acknowledged receipt of appellee's letter dated October 19, 1907, in which Porter stated that he had written to a local agent to look over the lands; another letter of February 8, 1908, in which Porter asked appellee to advise him if the owners of the land would be willing then to accept a lower price than the price named, and asking appellee to advise him of the best terms that the owners would take. The letter of February 8, 1908, had a notation at the bottom stating the terms upon which the owners would sell the lands, and advising that they would let it go at such price, but "no less." Another letter from Porter to appellee dated June 27, 1908, in which Porter stated that if he did not obtain certain lands in Michigan under negotiations that were then pending, he would be in the market for any good proposition in Arkansas, etc. And a letter from Porter to appellee dated November 27, 1908, in which Porter stated that the gentlemen who had once accompanied him to Arkansas, and who appellee had met would be down again and look over the lands, and referring in the letter to certain particulars in regard to the lands which appellee had before furnished him. Another letter from appellee to Porter dated December 12, 1908, in which he tells Porter that the owners of the land would raise the price on the 1st of January, and urging him to decide to take the same. Appellee also introduced a letter which he wrote to appellant H. A. Moore on date February 9, 1910, in which he informed Moore that he had interested a party from Markle, Indiana, who was coming to look at appellants' lands; and also a letter from appellee to H. A. Moore, dated February 21, 1910, in which appellee stated that the prospect for selling the land to the man from Markle, Indiana, was favorable; and another letter to Moore of February 4, 1910, in which appellee stated that the party who was to come down and look at the land was reported sick, and would come as soon as he recuperated. Also a letter from L. E. Moore to the appellees, dated April 25, 1910, in which Moore en-

closed a list of lands, and stating that if a certain sale was made, they would pay appellee a commission, and giving appellee the number to call in the event he should wish to see appellants about their lands. These letters showed a correspondence between Porter and appellee as to the purchase of the lands mentioned in appellee's complaint and other lands. The last of the series of letters between appellee and Porter was of date ten months prior to the date of the contract upon which appellee sues. All of these letters were introduced over the objections of appellants.

Continuing his testimony, appellee stated that he had conversations with appellants in regard to the sale of the land for quite a while; that at one time he had the sale almost consummated with Porter for a price of $3,200, and that appellants allowed the sale to drop because of a controversy in regard to commission. He stated that the land was afterward sold to Porter at $12 an acre. He stated that he introduced Porter to the Moores and brought them together by correspondence; that the land was in his hands at the time it was sold, and he seemed to have full control as far as an agent was concerned. He notified Moore that he was claiming a commission.

On cross-examination, he stated that the contract price for which he was to sell the land was $13 per acre, with 5 per cent commission. He stated that he was the party who first interested Porter in the land, and was the procuring cause of the sale.

The appellants testified that the land was sold to Porter by them through one Harry Saxe, whom they paid a commission of 5 per cent. The land was sold to Porter for $12.50 per acre. The land was sold in June, 1911. They stated that they had some conversation with Moss in regard to the sale of the land in which they told him that if he sold the land, they would pay him a commission, but that at the same time they had the land in the hands of of other agents, and that they reserved the right to sell it themselves. They denied that appellee ever told them that he had a buyer. Stated that they never did enter into

a contract with him for the purpose of selling the land; that he never mentioned Porter's name to them. Some time after the sale was made, appellee did state to appellants that he thought he should have a commission.

One of the appellants testified that they first heard of Porter through one Severance. The letter that Moss wrote one of the appellants in 1910 was about other lands altogether, and another party. When Saxe wrote appellants, asking if they would pay him a commission if he sold the land, they advised him that they would, and they did not know at that time who the purchaser was.

Witness Saxe testified on behalf of appellants that he conducted the negotiations for the sale of the lands from appellants to Porter. He represented Porter, and was instructed by him to look up lands and report to him. At one time there was a deal between Porter and Moore Brothers for the land, but it was dropped. After witness got the agency from the Moores to sell the land, he wrote Porter what the land could be bought for, and was instructed by the latter to buy it. At that time, Ross & Caldwell were the agents for Moore Brothers, and Porter wrote the witness to take the matter up with Ross & Caldwell. The first man who showed the land to Porter was Mr. Baldock. Baldock first took the witness on the land in 1907. The trade that they were contemplating then was not perfected on account of the panic. Neither Moss nor Porter ever went with witness on the land. When witness sold Porter the lands for the Moores he received no commission from Porter.

Witness Baldock testified that in 1907 he showed Saxe the land for Mr. Porter, as he understood. He was a member of the firm of Caldwell Realty Company. Mr. Moss had nothing to do with showing the lands to Saxe in 1907.

Porter testified on behalf of appellants, in substance, that his attention was first called to the land of appellants by one Severance; that Severance first submitted to him the proposition of buying the land; that the appellee did

not have anything to do with bringing about the sale; that he had correspondence with appellee in the latter part of 1907 and the first part of 1908, in regard to the purchase of the entire tract of land owned by appellants, consisting of about 2,400 acres, but the correspondence did not result in a sale. The sale was made through Severance and Harry Saxe.

The testimony of Severance tended to corroborate the testimony of Saxe. He stated that the sale was brought about partly through the representation of witness, but largely by Saxe. Witness stated that appellee had nothing to do with the sale of the lands; that during the year 1906, witness had a conversation with Moore concerning the lands and partially examined them, and upon his return to Michigan called Porter's attention to the tract, and in 1908, Porter and witness made a trip to Arkansas for the purpose of looking over the lands. They were joined by Saxe and Moore. After an examination of the lands, they decided that the price was too high and the deal was called off. Later, in the year 1911, Porter negotiated with Moore for the lands. Witness was a brother-in-law of Porter.

Caldwell testified that he remembered when there was a deal pending between Moss and Porter for the lands. That sale did not go through.

The court granted, among others, the following prayers at the instance of the appellee:

2. "You are instructed that if you believe from the testimony that the defendants placed this land with the plaintiff to sell, and that through him entered into negotiations with W. P. Porter in regard to the sale of the lands, and afterward procured a proposition from W. P. Porter, which was acceptable to the defendants, but the trade fell through by reason of some dispute as to commission, and afterward became the purchaser of the lands from the defendants, then the plaintiff would be entitled to recover, and you will find for him in the amount which he was to receive for the same."

3. "You are instructed that if you believe from the testimony that the plaintiff was authorized to sell the land for which he now claims commissions, together with other lands, and if, after the property was placed in the hands of the plaintiff, the sale was brought about or procured by his correspondence or negotiation or exertions, he would be entitled to his commission, and if you find such to be the case, you must find for the plaintiff."

The court also granted several prayers for instructions in which it, in effect, told the jury that if they believed from the testimony that the plaintiff was authorized to sell the land, and that afterward the plaintiff disclosed the name of the purchaser, W. P. Porter, to the defendants, and thereupon the plaintiff began negotiations and correspondence with the purchaser, W. P. Porter, and through such disclosures the negotiations were begun and the sale of the property was effected, then the plaintiff will be entitled to his commissions, although the jury might find that the sale was consummated by the owners.

*P. R. Andrews* and *John DeBois,* for appellants.

It was error to admit the letters of J. S. Moore as to an old and abandoned contract. These letters were calculated to mislead the jury and prejudicial. The instructions referring to these letters were also prejudicial and abstract. 91 Ark. 212; 55 *Id.* 574; 89 *Id.* 147; 94 *Id.* 350; 71 *Id.* 197; 6 A. & E. Ann. Cases, 564; 13 Enc. Ev. 680, 663, 672; 59 Ark. 165; 11 Enc. Ev. 210.

*S. Brundidge, Jr.,* for appellee.

The letters of J. S. Moore were competent. Appellee's contract was continued from time to time, and the correspondence was admissible to show who interested Porter to purchase the lands.

There is no error in the instructions complained of. 106 Ark. 536; 89 Cal. 251; 84 Ark. 462.

Where a broker is the procuring cause of the sale, he is entitled to his commissions, notwithstanding the sale was finally made by the owner himself. 53 Ark. 49; 76 *Id.* 375; 88 *Id.* 375; 89 *Id.* 195; 84 *Id.* 462.

WOOD, J., (after stating the facts). Appellee seeks to recover under a contract which he alleges was made with the appellants on the 20th of October, 1909, and he was permitted to introduce letters concerning a contract that was made with J. L. Moore, who had since died. Under that contract, appellee was to sell the land at $12 per acre and receive 5 per cent commission of the purchase price. Appellee himself admits in his testimony that this contract "did not materialize." These letters bore date from some time in October, 1907, up to as late as December 26, 1908, the last letter being some ten months before the present contract is alleged to have been entered into. Under this last contract appellee alleged that he was to secure a purchaser for the lands, and did succeed in selling the same at $13 per acre.

These letters were well calculated to mislead the jury and were highly prejudicial to appellants. The contract for the sale of lands entered into in 1907 or 1908 had nothing to do with the contract sued on. The issue was sharply drawn as to whether or not appellee had procured Porter to purchase the lands under the contract upon which he sued, and the inquiry should have been directed to that. The fact that appellee may have interested Porter in the lands in 1907 or 1908, under contract, expecting to sell the lands at that time, which the letters tended to prove, did not show or tend to show that the appellee procured Porter to purchase the lands under the contract on which he sued.

The contract with J. L. Moore was an entirely different contract from the one in suit, with different parties, and the correspondence had with Porter tending to show what appellee had done under that contract was wholly incompetent under the issues joined in the present suit.

Appellee testified that he brought Porter and the Moores together by correspondence. These incompetent letters constituted the correspondence to which he refers, as there were no other letters after the date of the contract on which he sued introduced in evidence tending to

prove that he brought the Moores and Porter together under this contract.

The instructions, in which the court refers to the correspondence and permits the jury to consider the letters in determining the issue as to whether or not appellee, by correspondence with Porter, interested him in these lands and procured him as a purchaser for the same, were likewise prejudicial for the reason that they were abstract, there being no testimony upon which to predicate the same. Except in the particulars herein mentioned, the instructions of the court conform substantially to the law as has been often announced by this court. *Scott* v. *Patterson*, 53 Ark. 52; *Taylor* v. *Godbold*, 76 Ark. 395; *Pinkerton* v. *Hudson*, 87 Ark. 506; *Branch* v. *Moore*, 84 Ark. 462; *Stiewel* v. *Lally*, 89 Ark. 195; *Blumenthal* v. *Bridges*, 91 Ark. 212; *Poston* v. *Hall*, 97 Ark. 23.

It is unnecessary to reiterate the principles announced in these decisions.

Appellants insist that most of the other prayers for instructions besides the ones above considered were abtract, but inasmuch as the case must be reversed for the errors indicated, and as different facts may be developed on another trial, we will not pass upon the question as to whether or not other instructions than those mentioned above were abstract and prejudicial.

For the error indicated, the judgment is reversed and the cause remanded for a new trial.